[No. 4908–1. Division One. June 8, 1978.]

CARLYLE BUTCHER, *Respondent,* v. GARRETT–ENUMCLAW
COMPANY, *Appellant.*

*Short, Cressman & Cable,* and *Phillip Offenbacker,* for appellant.

*Ruthford, Lind, Van Valin & Watts* and *Charles E. Watts,* for respondent.

DORE, J.—Plaintiff Butcher sued the defendant Garrett–Enumclaw Company, a manufacturer, for breach of express and implied warranties relating to the 1973 sale of its portable sawmill called the "Ecologizer." The Ecologizer was a new and unique concept for a commercial sawmill incorporating log cutting and log handling principles not found in ordinary sawmills. The jury awarded damages to the plaintiff of $56,011.22 for expenses, lost and reduced business profits, return of his purchase money, and the cost of modifying the waste disposal system. Defendant appeals on various assignments of error including the improper admission of evidence, jury instructions and denial of defendant's counterclaim.

## FACTS

The Ecologizer was invented and patented by a man named Cockle. It was touted by the defendant manufacturer at various fairs and in written public relation statements and brochures to be "the first truly portable small log sawmill that turns waste wood into valuable lumber."

The defendant, apparently intending to go into mass production with the Ecologizer, prepared a handsome brochure depicting the Ecologizer on one side, and on the back

side making various representations to future purchasers as to its operational abilities as follows:

*Now it pays* to harvest the small logs you've always left because they didn't pay. The Garrett Ecologizer makes dimension lumber from small logs in one pass at infinitely variable feed speed, and nothing left over but sawdust, which is 100% biodegradable. No slabs. No edgings.

The portable Garrett Ecologizer can be trailed to any woods site—be in operation in minutes. Just park it and start it up—no leveling or blocking needed. It's only 8 ft. wide, 7 1/2 ft. high and 16 ft. long in travel position. All moving parts are completely housed for safety, and all compartments are vandal proofed and locked.

A 3–man crew of your "regulars" can operate the Ecologizer. You don't need an experienced "sawyer." The operator feeds in logs up to 10" diameter and the machine squares them, first on two sides, then top and bottom, and rips into the desired dimension lumber. *It handles any species of marketable timber,* and the lumber quality is excellent, with the majority being select structural grade.

(Italics ours.)

In 1973 the defendant began the development of the Ecologizer and about that time the plaintiff, a successful sawmill operator, having read defendant's literature became interested in purchasing one. At that time the defendant was operating a prototype Ecologizer at its Enumclaw test area and plaintiff inspected the prototype there on several occasions and test–ran random logs on the prototype.

On May 9, 1973, the plaintiff signed a purchase order to buy the "first production model" for $38,700. The subject matter of the written order read: "One Garrett Ecologizer— to be delivered—first production model." At the time of the signing of the purchase order there was no production model in existence. At the trial it developed that there was only *one* prototype of the Garrett Ecologizer, not *two* as previously represented when plaintiff inspected the Ecologizer at Enumclaw. There was evidence that in the 5 months subsequent to the signing of the purchase order

that substantial design changes were made in the "first production model" sold to the plaintiff which made it differ in several important areas from the only prototype ever made by Garrett. The plaintiff in effect received, without his knowledge, a second prototype rather than a "first production model" suitable for commercial use. The "first production model" of the Ecologizer, the actual machine received by the plaintiff, had been test run only a few hours by the manufacturer prior to its delivery to plaintiff. It is undisputed that plaintiff wanted and was told by the seller he was getting a "production model" capable of commercial operations on a full–time basis, 8 hours a day, 7 days a week. As soon as plaintiff began using the "production model" it showed design problems requiring its return to the factory for redesign. Later when plaintiff began regular operation of the machine, it experienced frequent breakdowns, mismanufactured dimension lumber and required continual service by Garrett's personnel.

The plaintiff used the machine from November 1973 to November 1974 based on the continued assurance by defendant personnel that all of his problems with the Ecologizer would be solved. In spite of all the changes and redesign efforts and the continued assurances of the manufacturer, the prototype machine ran only for an hour or so at a time. The final straw that broke the camel's back was when the plaintiff tried to commercially cut cedar logs; the machine became inoperative and was shut down.

In December 1974 plaintiff returned the inoperative machine to the defendant. There was testimony at the trial that all of the defects of the machine could have easily been observed by the manufacturer if it had tested the machine under field conditions. The inventor of the Ecologizer testified that over his objection defendant's personnel had incorporated important design changes in the prototype with only a very limited testing of the modifications.

On its return defendant sold the Ecologizer at a public sale leaving a balance on the purchase price of $13,494.95 which they charged to plaintiff.

## ISSUES

ISSUE 1: Whether the trial court erred in excluding defendant's exhibit 17 (the purchase order) and exhibit 18 (the security agreement) on the basis that they contained language that was unreasonable and unconscionable under the provisions of the Uniform Commercial Code, RCW 62A.2–302 and RCW 62A.2–316?

ISSUE 2: Whether the trial court erred in allowing the plaintiff to testify to conversations with defendant regarding the capabilities of the Ecologizer?

ISSUE 3: Whether a brochure of the defendant (exhibit 38) limiting the warranties of the manufacturer was properly excluded?

ISSUE 4: Whether the trial court erred in admitting exhibits 6 and 40 (defendant's Ecologizer brochures) which contained express warranties of the manufacturer to buyers?

ISSUE 5: Whether the court erred in failing to rule that plaintiff was an expert on sawmills and had no right to rely on defendant's representations and warranties?

ISSUE 6: Whether plaintiff's evidence as to lost profits was sufficient to sustain loss profit damages in the verdict?

ISSUE 7: Whether plaintiff, having accepted the Ecologizer, was entitled to later revoke such acceptance pursuant to RCW 62A.2–608(1)?

## DECISION

ISSUE 1: Purchase order and security agreement not integrated contracts.

That in reference to the purchase order (exhibit 17), we feel the trial judge properly excluded this exhibit for it contained two objectional paragraphs, as follows:

(a) on the front of the agreement was the language:

The front and back of this Order comprise the *entire* agreement affecting this purchase and no other agreement or understanding of any nature concerning same has been made or entered into or will be recognized. I hereby certify that no credit has been extended to me for

the purchase of this *motor vehicle* except as appears in writing on the face of this agreement.

I have read the matter printed on the back hereof and agree to it as part of this order the same as if it were printed above my signature. I certify that I am 21 years of age, or older and hereby acknowledge receipt of a copy of this order.

(Italics ours.)

(b) paragraph 7 on the back of the purchase order agreement had the following provision:

It is expressly agreed that there are no warranties, express or implied, made by either the dealer or the manufacturer or the Equipment, chassis or parts furnished hereunder except as may be stated on the front side of this order.

The Uniform Commercial Code RCW 62A.2–316— *Exclusion of Modification of Warranties,* provides:

(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (RCW 62A.2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

Exhibits 17 and 18 were offered for the purpose of permitting defendant to make his argument that he made no warranties incident to the sale to the plaintiff. Such exhibits contained no other relevant information to the transaction as the parties were not in dispute about the date of the sale and the other terms of the transaction including the purchase price.

The Uniform Commercial Code provides in RCW 62A.2–302, *Unconscionable Contract or Clause:*

(1) If the court as a matter of law finds the contract or any clause of the contract to have been *unconscionable* at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be *unconscionable* the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

(Italics ours.)

The trial court ruled as a matter of law that pursuant to the above cited sections of the Uniform Commercial Code, RCW 62A.2–302 and RCW 62A.2–316, that the two paragraphs in exhibit 17, (1) stating that the purchase order was an integrated contract that contained the entire agreement between the parties, and (2) a disclaimer against all warranties of any kind, whether express or implied, were *unreasonable and unconscionable.*

We agree.

Exhibit 17, the purchase order agreement, described the subject matter of the sale as "one Garrett Ecologizer—to be delivered—first production model." Originally it had been represented that there had been two tested prototypes of the Garrett Ecologizer and that the machine to be sold to the purchaser was to be the first production model. The evidence is undisputed that in fact the first production model in effect was the second prototype and it had been so substantially changed it was an entirely different machine than the original prototype, which machine the plaintiff buyer had observed and which had been tested by the defendant manufacturer and the inventor.

Exhibit 17 refers to the Ecologizer as a *motor vehicle.*

I hereby certify that no credit has been extended to me for the purchase of this *motor vehicle* except as appears in writing on the face of this agreement.

(Italics ours.)

Black's Law Dictionary defines "motor vehicle" as follows:

> In the Uniform Act Regulating Traffic on Highways, 11 U.L.A., and similar statutes, any self-propelled "vehicle," defined as including every device in, upon, or by which any person or property is or may be transported or drawn upon a highway, except devices moved by human or muscular power or used exclusively upon stationary rails or tracts. The term "motor vehicles," although sometimes regarded as synonymous with or limited to "automobiles," often has a broader meaning, and includes not only ordinary automobiles, but also motorbusses and trucks, as well as motorcycles. Blashfield, Cyc. of Automobile Law and Prac., Perm. Ed., § 2.

Again, Black defines "trailer" as:

> A separate vehicle, not driven or propelled by its own power, but drawn by some independent power; a semi-trailer is a separate vehicle which is not driven or propelled by its own power, but, which, to be useful, must be attached to and become a part of another vehicle, and then loses its identity as a separate vehicle.

■ It is apparent that at best the subject Ecologizer was on wheels and might be defined as a "trailer." By no stretch of the imagination could the Ecologizer be described as a *motor vehicle*. In view of this outright inaccuracy in the description of the subject matter of the sale, the purchase order (exhibit 17) could not be an integrated contract. To have permitted exhibit 17 to be admitted would have constituted prejudicial error. Had defendant moved to admit exhibit 17 with the two paragraphs in reference to integration and disclaimer excised, exhibit 17 would have been admissible but defendant made no such motion. We find no error by the trial court in excluding exhibit 17.

In *Schroeder v. Fageol Motors, Inc.*, 86 Wn.2d 256, 261–62, 544 P.2d 20, 24 (1975), it was stated:

As correctly noted by another court when faced with this situation:

. . .

The issue of unconscionability presents a question of law for the court; not an issue of fact for the jury. *Haugen v. Ford Motor Co.*, 219 N.W.2d 462 (N.D. 1974); *Central Ohio Co-operative Milk Producers v. Rowland*, 29 Ohio App. 2d 236, 281 N.E.2d 42 (1972); *Zicari v. Joseph Harris Co.*, 33 App. Div. 2d 17, 304 N.Y.S.2d 918 (1960). RCW 62A.2–302 states:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable *the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.*

(Italics ours.)

In accordance with the requisites set forth above, a court is not authorized to dispose of this issue under the rules governing summary judgment. *Zicari v. Joseph Harris Co., supra.* Instead, RCW 62A.2–302 envisions a full hearing at which time each party will have a "reasonable opportunity" to present evidence bearing on the question of unconscionability. Since exclusionary clauses in purely commercial transactions are prima facie conscionable, the burden of establishing that a clause is unconscionable lies upon the party attacking it. *Kohlenberger, Inc. v. Tyson's Foods, Inc., supra* [510 S.W.2d 55 (Ark. 1974)]; *Bill Stremmel Motors, Inc. v. IDS Leasing Corp.*, 89 Nev. 414, 514 P.2d 654 (1973).

In *Schroeder v. Fageol Motors, supra,* the court reversed the trial court and sent the case back for hearing in order to give the defendant a reasonable opportunity to present evidence as to its commercial setting. However, in the subject case such a hearing would be unnecessary and a duplication of what already had occurred. The trial judge ruled on the

admissibility of exhibits 17 and 18 after 12 days of comprehensive and extensive testimony by all parties. An examination of the record indicates little, if anything, was kept out. Such a hearing would only result in a duplication of the same testimony and would shed little new light, if any, on the situation. We note that defendant's attorney, when exhibits 17 and 18 were rejected, did not request the opportunity to present additional testimony surrounding the circumstances of the transaction for he apparently felt, as we hold, that all the evidence as to its "commercial setting" had previously been introduced.

Exhibit 18, the security agreement for "one Garrett Ecologizer, Serial No. GEE 111" under date of October 30, 1973, was executed approximately 3 weeks after the delivery of the Ecologizer. Above the signature of the parties this language appears: "No oral agreement, guaranty, promise, representation or warranty shall be binding." The trial court ruled that this statement did not conform to the requirement of RCW 62A.2–316 in that it does not use the particular words of use involved, especially as to "merchantability." The trial court found that in light of the conduct of the parties both before and after the sale, the written materials containing warranties that had been distributed, and the reliance of plaintiff on the defendant's representations and warranties, "that it would be unreasonable to hold that the above statement would be operative to remove all representations or warranties express or implied . . ."

We agree and hold that the disclaimer provision in the security agreement (exhibit 18) is unreasonable and unconscionable under the provisions of the commercial code and that the trial court properly excluded it.

ISSUE 2: Admissibility of parties' conversations regarding warranties and representations.

Defendant contends that the court erred in allowing testimony of a conversation between the parties concerning warranties and representations pertaining to the Ecologizer.

Plaintiff testified that he decided to purchase the Ecologizer about 1 week after his initial inspection and that he and defendant's employee Olsen discussed the "ability of the machine and how much output it would produce." Plaintiff was permitted to testify that Olsen had told him not to "count on" more than 10,000 board feet per day of production, and that the machine would handle *cedar* with no problem.

The trial court thought that this testimony was more in the nature of a description of what was being purchased rather than a warranty and apparently was not in conflict with the terms of the writing but only an aid in identifying the subject matter of the contract, *i.e.*, one Garrett Ecologizer, not yet constructed.[1]

However, in view of our holding that the purchase order (exhibit 17) and the security agreement (exhibit 18) are *not* integrated agreements, such conversations of the parties would be admissible in any event to establish warranties and representations and the terms of the contract of purchase.

ISSUE 3: Admissibility of manufacturer's post–sale brochure.

■ The trial court correctly excluded defendant's brochure (exhibit 38) which contained restrictive warranties pertaining to the Ecologizer, *after* the consummation of the subject sale. An examination of the record indicates that

---

[1]RCW 62A.1–103 provides that general principles of law and equity are to supplement the code. Parol evidence is admissible to identify the subject matter of a contract. 67 Am. Jur. 2d *Sales* § 199, at 321–22. Parol evidence is not admissible to vary or contradict the terms of an integrated contract but the parol evidence rule does not purport to exclude evidence offered for the purpose of interpreting and giving meaning to those terms. 3A Corbin, *Corbin on Contracts* § 543 (1960). In *W.E. Moses Land Scrip & Realty Co. v. Stack–Gibbs Lumber Co.*, 56 Wash. 529, 106 P. 207 (1910), the court allowed oral evidence to define and explain the term "Northern Pacific Scrip" and such evidence was not objectionable as tending to vary or add to the terms of the contract. It is evident from the facts in the present case that the term Ecologizer, as stated in the contract, must be given a meaning and interpretation before it can be determined whether an attempt is being made to vary or contradict it.

there is no evidence that this warranty on which the manufacturer severely limits its exposure for a defective machine was ever presented to the plaintiff prior to the signing of the security agreement. In fact, plaintiff testified he had never seen it until the time of trial. Olsen testified that he believed that it was shown to the plaintiff but he was unable to state specifically whether it was given to plaintiff on a specific date *before* the signing of the security agreement. Exhibit 38 was properly rejected.

ISSUE 4: Manufacturer's brochures pertaining to Ecologizer distributed prior to sale.

Other assignments of error were that the trial court erred in admitting exhibits 6 and 40 which are brochures containing express warranties as to the capabilities of the machine. Defendant claims that plaintiff did not rely on such representations in making his purchase. Again, we point out that when the purchase order was signed on May 9, 1973, the subject of the purchase was not in existence and the final product that was manufactured was a substantial change from the first prototype. The jury could well have found that the final purchase didn't take place until early November 1973, some 5 months after the signing of the purchase order and that plaintiff relied on all representations by the manufacturer, whether oral or written, in making his decision whether to accept this modified prototype.

■ The act of purchase and use of the Ecologizer by plaintiff is evidence of his reliance on the skill and expertise of Garrett, the manufacturer and seller. *Kasey v. Suburban Gas Heat*, 60 Wn.2d 468, 472, 374 P.2d 549, 552 (1962), wherein it was stated:

> The act of purchase and use of a product manufactured for that use is evidence of reliance on the skill and judgment of the manufacturer; and, in the absence of evidence to the contrary, meets the requirement of reliance.

In any event the court instructed on "reliance of purchaser" and the jury by their decision apparently believed that plaintiff relied on these express warranties as illustrated in the manufacturer's presale brochures (exhibits 6, 40). Exhibits 6 and 40 were properly admitted.

ISSUE 5: Plaintiff, although a sawmill expert, was *entitled to rely* on seller's representations and warranties.

 The manufacturer assigns error for failure of the court to hold that the plaintiff was an expert in sawmills and therefore had no right to rely upon any representations or warranties of the defendant. It is true that plaintiff had considerable training and background in the manufacture and operation of sawmills. However, this was a very unique machine. In fact, defendant in its promotional literature called it "the first truly portable small log sawmill that turns waste wood into valuable lumber." Obviously no one was an expert in the manufacture of the Ecologizer and actually the machine delivered to the plaintiff in this case had never been fully tested and was not the first production model but was the second prototype. We hold that the court correctly instructed the jury as to the weight to be given the testimony of an expert witness.

ISSUE 6: Lost profits as element of damages.

Defendant argues that the trial court erred in admitting evidence of lost profits, contending that plaintiff's evidence of lost profits clearly failed to meet the standard of *reasonable* accuracy.

 In *Larsen v. Walton Plywood Co.*, 65 Wn.2d 1, 15, 390 P.2d 677, 686 (1964), our Supreme Court stated:

Are lost profits recoverable? The modern view is that they are properly recoverable as damages when (1) they are within the contemplation of the parties at the time the contract was made, (2) they are the proximate result of defendant's breach, and (3) they are proven with reasonable certainty. See *Hole v. Unity Petroleum Corp.*, 15

Wn. (2d) 416, 131 P. (2d) 150; McCormick on Damages § 25.

In *Larsen,* the court stated on page 16:

The third rule requires that lost profits must be proven with reasonable certainty or conversely, damages which are remote and speculative cannot be recovered . . .

. . .

A measuring stick, whereby damages may be assessed within the demarcation of reasonable certainty, is sometimes difficult to find. Plaintiff must produce the best evidence available and

". . . if it is sufficient to afford a reasonable basis for estimating his loss, he is not to be denied a substantial recovery because the amount of the damage is incapable of exact ascertainment. . . ." *Dunseath v. Hallauer* [41 Wn.2d 895, 253 P.2d 408 (1953)], p. 902.

See also *Buchanan v. Hammond,* 54 Wn. (2d) 354, 340 P.(2d) 556.

The usual method of proving lost profits is from profit history. It is argued that where a plaintiff is conducting a new business with labor, manufacturing and marketing costs unknown, prospective profits cannot be awarded. This is the so–called new business rule and has long been the law of Washington. *Engstrom v. Merriam,* 25 Wash. 73, 64 Pac. 914; *Webster v. Beau,* 77 Wash. 444, 137 Pac. 1013; *Andreopulos v. Peresteredes,* 95 Wash. 282, 163 Pac. 770; *Lockit Cap Co. v. Glove Mfg. Co.,* 158 Wash. 183, 290 Pac. 813; *Hole v. Unity Petroleum Corp.,* 15 Wn. (2d) 416, 131 P. (2d) 150; *Ingersol v. Seattle–First Nat. Bank,* 63 Wn. (2d) 354, 387 P. (2d) 538.

Respondents deny that Washington's continuation of the Walton Plywood Company business under the extant circumstances was a new business. They suggest that, in any event, the reasons for the rule vanish when analysis of market conditions and a profit showing of identical or similar businesses in the vicinity, operating under substantially the same conditions is made. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U. S. 251, 90 L. Ed. 652, 66 S. Ct. 574. The rule is succinctly stated in *Barbier v. Barry,* 345 S. W. (2d) 557, 563 (Tex. Civ. App. 1961), as follows: ". . . lost profits will not be denied merely because a business is new if factual data is available to furnish a basis for computation of probable losses. . . ." Its rationale is stated as follows: ". . . Where the fact is well

established that profits would have been made and the difficulty in proving their amount is directly caused by the defendant's breach, a greater liberality is permitted in making estimates and drawing inferences. . . ." 5 Corbin on Contracts § 1023, p. 133.

Respondents point out that a reasonable method of estimation of damages is often made with the aid of opinion evidence. Experts in the area are competent to pass judgment. So long as their opinions afford a reasonable basis for inference, there is departure from the realm of uncertainty and speculation. Expert testimony alone is a sufficient basis for an award for loss of profits. *Bogart v. Pitchless Lbr. Co.,* 72 Wash. 417, 130 Pac. 490; *Bromley v. Heffernan Engine Works,* 108 Wash. 31, 182 Pac. 929, and *Warner v. Channell Chemical Co.,* 121 Wash. 237, 208 Pac. 1104.

Plaintiff had been in the manufacture and operation of sawmill businesses for nearly 35 years, and undoubtedly he was an expert in the sawmill business. Defendant agrees for in his brief he characterizes plaintiff as "an expert in the sawmill business, having many years of experience as a conventional sawmill operator and consultant." Although the Ecologizer was a new and unique machine it was being operated within the framework of an old and established business. While plaintiff was not an expert in the design of the Ecologizer, he most certainly knew what commercial sawmills should be capable of producing. Plaintiff also knew the markets for the product and from prior experience he knew the income and expense figures for conventional sawmills. In no way could it be said that plaintiff would be operating a *new* business.

In *Larsen* it was held that ". . . expert testimony alone is a sufficient basis for an award of lost profits." Plaintiff's testimony alone was sufficient to eliminate speculativeness and qualified plaintiff's case to go to the jury for proper weighting.

In the subject case plaintiff gave his opinion of anticipated costs and expenses if the Ecologizer had run in a commercial manner, the way it had been intended by both

he and the manufacturer. He based calculations on a production of 10,000 board feet of lumber per day which figure had been given by defendant's personnel. These calculations of anticipated income and expenses, based upon the prevailing log purchase and lumber sales prices, were compared against the plaintiff's actual performance using average monthly expenses and income based upon actual invoice prices for monthly production based upon actual days of operation. Plaintiff's testimony was buttressed by the introduction into evidence of his check registers for the years 1973 and 1974. Defendant's counsel skillfully cross-examined plaintiff and undoubtedly affected the total award because the jury awarded less than plaintiff had requested. Plaintiff's expert opinion evidence on loss of future profits would be sufficient alone to support a jury award on this subject matter.

ISSUE 7: Right to revoke acceptance of goods under Uniform Commercial Code.

Defendant argues that plaintiff cannot revoke acceptance of the Ecologizer and simultaneously avoid paying the balance of the purchase price. He contends that once the buyer has accepted goods, he incurs the obligation to pay the purchase price. RCW 62A.2-607(1) provides, "The buyer must pay at the contract rate for any goods accepted." Only where the buyer can revoke his acceptance, pursuant to RCW 62A.2-608, may a buyer who has already accepted goods avoid paying the purchase price.

Defendant states that the plaintiff cannot revoke this acceptance of the Ecologizer because it has suffered a "substantial change in condition" through the plaintiff's use and modification of the machine. RCW 62A.2-608(2) provides:

Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

Plaintiff testified at the trial that he was induced into the retention of the machine and made modifications of the machine under the seller's direction and his continued representations that they would fix whatever problems he had with it. Seller cannot avail himself of RCW 62A.2-608(2) to foreclose plaintiff's revocation of acceptance as many of the modifications of the machine were performed by defendant's own personnel, or if plaintiff participated in such modifications it was under defendant's direction.

The trial court correctly ruled that under such evidence a fact issue existed as to plaintiff's right to return the machine and defendant's right to recover the purchase price. The fact issue centers around the question phrased in terms of "acceptance," RCW 62A.2-606. Acceptance requires payment of the purchase price, RCW 62A.2-607(1) unless the buyer effectively revokes his acceptance, RCW 62A.2-608.

The question is two–fold: First, was there an acceptance? Second, if there was such an acceptance, did the buyer effectively revoke it thereafter? The court instructed the jury on the issue of acceptance and revocation. In its literature the defendant manufacturer states: "It handles any species of marketable timber and the quality is excellent . . ." In fact, this representation was totally false for when plaintiff attempted to run some cedar logs into the machine, it became inoperative. It was at that point that plaintiff returned the machine. This is evidence from which the jury obviously found would justify the revocation of a previously accepted machine. The use of the machine actually constituted testing that should have been done by the manufacturer before delivery to the buyer. During the 13 months that the plaintiff had the machine and malfunctions occurred, there is substantial testimony that the seller manufacturer continually assured the plaintiff that he was going to get it corrected.

We find that although plaintiff originally had accepted the Ecologizer, there was evidence whereby the jury could

find and did through their verdict that plaintiff was authorized to revoke this acceptance and return the machine pursuant to RCW 62A.2–608.

We find no error.

Judgment affirmed.

WILLIAMS, J., concurs.

FARRIS, C.J. (concurring in the result)—I concur in the result reached by the majority.

Reconsideration denied July 31, 1978.

Review denied by Supreme Court December 1, 1978.